NMA:EAG/AL
F.#2011R01745

**M 11-1049**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    -against-

JOSEPH PETILLO,

        Defendant.

- - - - - - - - - - - - - - X

**To Be Filed Under Seal**

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF ARREST WARRANT

(T. 18, U.S.C., § 894(a)(1)

EASTERN DISTRICT OF NEW YORK, SS:

    SCOTT CURTIS, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation, duly appointed according to law and acting as such.

    Upon information and belief, in or about and between November 2010 and January 2011, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JOSEPH PETILLO, together with others, did knowingly and intentionally conspire to participate in the use of extortionate means to collect and attempt to collect an extension of credit from John Doe, an individual whose identity is known to your deponent.

    (Title 18, United States Code, Sections 894(a)(1) and 3551 et seq.)

The source of your deponent's information and the grounds for his belief are as follows:

1. I have been a Special Agent with the Federal Bureau of Investigation since 1996. During my tenure with FBI, I have been involved in various criminal investigations of organized crime. These investigations have utilized, among other investigative techniques, the use of physical and electronic surveillance, execution of search warrants, consensual recordings and debriefing of confidential sources. Through my training, education and experience, I have become familiar with organized crime activities, including illegal activities involving different forms of illegal gambling, loansharking and extortion, and the efforts of persons involved in such activity to avoid detection by law enforcement.

2. I am familiar with the facts and circumstances of this investigation from, among other things: (a) my personal participation in this investigation, (b) information obtained from cooperating witnesses, (c) information obtained from other law enforcement agents, and (d) recordings made by cooperating witnesses. Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I have hearsay knowledge. Because this affidavit is being submitted for the limited purpose of establishing probable cause to arrest the defendant, I have not set forth each and every fact learned during the course of

this investigation. Instead, I have set forth only those facts that I believe are necessary to establish probable cause for the arrest.

## THE COLOMBO ORGANIZED CRIME FAMILY

3. At all times pertinent to this complaint, the members and associates of the Colombo organized crime family of La Cosa Nostra constituted an "enterprise," as defined in Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact (hereinafter, the "Colombo crime family" and the "enterprise"). The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise. The Colombo crime family engaged in, and its activities affected, interstate and foreign commerce. The Colombo crime family was an organized criminal group that operated in the Eastern District of New York and elsewhere.

4. La Cosa Nostra operated through organized crime families. Five of these crime families - the Bonanno, Colombo, Gambino, Genovese and Luchese crime families - were headquartered in New York City and supervised criminal activity in New York, in other areas of the United States and, in some instances, in other countries. Another crime family, the Decavalcante crime family, operated principally in New Jersey, but from time to time also in New York City.

5. The ruling body of La Cosa Nostra, known as the "Commission," consisted of leaders from each of the crime families. The Commission convened from time to time to decide certain issues affecting all of the crime families, such as rules governing crime family membership.

6. The Colombo crime family had a hierarchy and structure. The head of the Colombo crime family was known as the "boss." The Colombo crime family boss was assisted by an "underboss" and a counselor known as a "consigliere." Together, the boss, underboss and consigliere were the crime family's "administration." With the assistance of the underboss and consigliere, the boss was responsible for, among other things, setting policy and resolving disputes within and between La Cosa Nostra crime families and other criminal groups. The administration further supervised, supported, protected and disciplined the lower-ranking participants in the crime family. In return for their supervision and protection, the administration received part of the illegal earnings generated by the crime family. Members of the Colombo crime family served in an "acting" rather than "official" capacity in the administration on occasion due to another administration member's incarceration or ill health, or for the purpose of seeking to insulate another administration member from law enforcement scrutiny. Further, on occasion, the Colombo crime family was overseen by a "panel" of

crime family members that did not include the boss, underboss and/or consigliere.

7. Below the administration of the Colombo crime family were numerous "crews," also known as "regimes" and "decinas." Each crew was headed by a "captain," also known as a "skipper," "caporegime" and "capodecina." Each captain's crew consisted of "soldiers" and "associates." The captain was responsible for supervising the criminal activities of his crew and providing the crew with support and protection. In return, the captain often received a share of the crew's earnings.

8. Only members of the Colombo crime family could serve as a boss, underboss, consigliere, captain or soldier. Members of the crime family were referred to on occasion as "goodfellas" or "wiseguys," or as persons who had been "straightened out" or who had their "button." Associates were individuals who were not members of the crime family, but who nonetheless engaged in criminal activity for, and under the protection of, the crime family.

9. Many requirements existed before an associate could become a member of the Colombo crime family. The Commission of La Cosa Nostra from time to time limited the number of new members that could be added to a crime family. An associate was also required to be proposed for membership by an existing crime family member. When the crime family's administration considered the associate worthy of membership, the

administration then circulated the proposed associate's name on a list given to other La Cosa Nostra crime families, which the other crime families reviewed and either approved or disapproved. Unless there was an objection to the associate's membership, the crime family then "inducted," or "straightened out," the associate as a member of the crime family in a secret ceremony. During the ceremony, the associate, among other things: swore allegiance for life to the crime family above all else, even the associate's own family; swore, on penalty of death, never to reveal the crime family's existence, criminal activities and other secrets; and swore to follow all orders issued by the crime family boss, including swearing to commit murder if the boss directed it.

### Methods and Means of the Enterprise

10. The principal purpose of the Colombo crime family was to generate money for its members and associates. This purpose was implemented by members and associates of the Colombo crime family through various criminal activities, including drug trafficking, robbery, extortion, fraud, illegal gambling and loansharking. The members and associates of the Colombo crime family also furthered the enterprise's criminal activities by threatening economic injury and using and threatening to use physical violence, including murder.

11. Although the primary purpose of the Colombo crime family was to generate money for its members and associates, the

members and associates at times used the resources of the family to settle personal grievances and vendettas, sometimes with the approval of higher-ranking members of the family. For those purposes, members and associates of the enterprise were asked and expected to carry out, among other crimes, acts of violence, including murder and assault.

12. The members and associates of the Colombo crime family engaged in conduct designed to prevent government detection of their identities, their illegal activities and the location of proceeds of those activities. That conduct included a commitment to murdering persons, particularly members or associates of the crime families, who were perceived as potential witnesses against members and associates of the enterprise.

13. Members and associates of the Colombo crime family often coordinated criminal activity with members and associates of other organized crime families.

## THE DEFENDANT

14. At various times relevant to his Complaint, the defendant JOSEPH PETILLO was an associate of the Colombo crime family. On or about January 31, 2001, PETILLO was arraigned on an indictment in United States District Court for the Eastern District of New York charging, among other crimes, racketeering and racketeering conspiracy. In the indictment, PETILLO was alleged to be an associate of the Colombo crime family. PETILLO thereafter pleaded guilty and was sentenced to 120 months'

incarceration. PETILLO was released on or about April 22, 2009 and is currently serving a three-year term of supervised release.

### EXTORTION CONSPIRACY

15. As described herein, there is probable cause to believe that the defendant JOSEPH PETILLO, together with others, conspired to participate in the use of extortionate means to collect and attempt to collect an extension of credit in the amount of $100,000 from John Doe. Specifically, PETILLO recruited Anthony Russo ("Russo"), who was an acting captain in the Colombo crime family, to seek the assistance of Reynold Maragni ("Maragni"), who was a captain in the Colombo crime family, to collect money owed by John Doe.

A. INFORMATION FROM COOPERATING WITNESS #1

16. An individual ("CW-1") who was a member of the Colombo crime family and who is now cooperating with the government has advised as follows, in sum and substance and in part:[1]

    a. In or about and between February 2009 and January 2011, Anthony Russo was a member of the Colombo crime

---

[1] CW-1 has pled guilty, pursuant to a cooperation agreement with the United States Attorney's Office for the Eastern District of New York, to racketeering conspiracy, including murder as a predicate racketeering act. In exchange for his cooperation, CW-1 is hoping to receive leniency at sentencing and admission into the Witness Security program. The information provided by CW-1 regarding La Cosa Nostra activities in New York has been corroborated in numerous ways, including by information from other confidential sources, cooperating witnesses, consensual recordings and other physical evidence.

family. In or about ~~May~~ June 2010, Russo was elevated to the position of acting captain and continued to hold that position until his arrest in January 2011.

        b. Reynold Maragni was also a member of the Colombo crime family and as of November 2010, held the position of captain, a position that he too continued to hold as of his arrest in January 2011.

        c. In or about 2010, a high-ranking member of the Colombo crime family directed Russo to determine whether the defendant JOSEPH PETILLO wanted to become an inducted member of the Colombo crime family. Russo subsequently asked the defendant JOSEPH PETILLO if he wanted to be inducted into the Colombo crime family, but the defendant JOSEPH PETILLO said, in sum and substance, that he did not want to become inducted at that time.

B.    <u>CONSENSUAL RECORDINGS MADE BY COOPERATING WITNESS #2</u>

        17. On or about November 28, 2010, an individual ("CW-2"),[2] who was an associate of the Colombo crime family and who is cooperating with the government, met with Russo in Staten Island, New York. The meeting was consensually recorded by CW-2 who was wearing a recording device during the meeting. CW-2 has

---

[2] CW-2 has pled guilty, pursuant to a cooperation agreement with the United States Attorney's Office for the Eastern District of New York, to racketeering conspiracy, including murders as predicate racketeering acts. In exchange for his cooperation, CW-2 is hoping to receive leniency at sentencing and admission into the Witness Security program. The information provided by CW-2 regarding La Cosa Nostra activities in New York has been corroborated in numerous ways, including by information from other confidential sources, cooperating witnesses, consensual recordings and other physical evidence.

advised that during the meeting, Russo told him that Russo was going to schedule a meeting with the defendant JOSEPH PETILLO for the following day.

18. On or about November 29, 2010, CW-2, who was again equipped with a recording device, met with Russo and others, and shortly thereafter, met with Russo and the defendant JOSEPH PETILLO in Brooklyn, New York. A review of the recording consensually made on or about November 29, 2010 revealed that Russo placed a call and asked the person on the other end of the telephone call if his "friend was around?," and then told the person who answered the telephone to tell the "friend" that Russo needed to see him in ten minutes.

19. Approximately ten minutes later, CW-2 and Russo ("AR") met with the defendant JOSEPH PETILLO ("JP"). The following is a transcript of an excerpt of the consensually-recorded conversation:[3]

> AR: Now what was that thing you were telling me about? The guy in Florida?
>
> JP: Oh, that's what, when you said Reynolds, I thought, "Oh good, he found the guy."
>
> AR: No. What is it with that guy?
>
> JP: [UI]
>
> AR: Who's this guy now?
>
> JP: Patty, [name of John Doe], his name is. Patty Book.

---

[3] The excerpts provided herein are based on draft transcripts and are subject to revision.

AR: [UI] Patty Book, [last name of John Doe]. Remember that.

JP: He was around, he was around, he was from, he was from Myrtle Avenue. He was around Haha and Johnny Green and Vinny from [UI].

AR: Johnny Green and Vinny TV -

JP: Yeah. So Vinny TV met me, I think right here in the diner. And um, and then when I was upstate with him, I said, you know, I mean in Otisville, I know you from somewhere. I know you [UI].

AR: Vinny?

JP: Yeah, Vinny. I know you. Johnny Green [UI]. And I says, did you "Oh yeah, the guy in Florida, money in car wash. This and that, yeah. Whatever happened with that?" 'Cause the father came here, you know. [UI] And he goes, [UI] has nothing to do with it; my son has nothing to do with it. It's the other son. He says, [UI] owe the other kid money. No we didn't. Anybody know what the son looks like. He brought his son to the restaurant. We're all sitting there. The kid that gave him the money said, "That's him." You know. And he goes, "Alright, alright, I'll pay yous 500." [UI]

AR: 500?

JP: 500 a week.

AR: Okay.

JP: Give me 500 a week. Brief settlement. It was a $100,000.

AR: Right.

JP: When he took the money, the last 20. Come on, he says, "please, you gotta take my Rolex." Fuckin' Rolex. I want to shove it up his *ass*.

CW-2: He's still out there?

AR: So how much does he owe you?

JP: You want me to tell you the juice in ten years?

AR: So he still owes you 20?

JP: 100.

AR: So he never paid you?

JP: No. Never paid. He stood two, three, maybe three weeks, gave me 500.

JP: And then when I ran into Johnny Green in the bull pen, he said, he said, "What happened with that?" I said "John, [UI] last time I met [UI]." I said "John [UI]."

CW-2: [Laughing]

AR: I don't want to talk about nothing.

JP: I said, I'm done with that.

AR: Alright. [UI]

JP: So the best way to get the guy. I was talking with Reynolds, he said. [UI] I'm going to see Vinny right now. I mean, Vinny TV.

AR: Who said that?

JP: Reynolds [UI]. I seen Reynolds [ui].

AR: Oh right, right, right.

JP: And he says, "I'll go see him right now."

AR: Did you tell me about that?

JP: Yeah, I mentioned it to him.

AR: I'm going to bring it up to him right now.

Based on my training, experience and knowledge of this investigation, I believe "Haha," "Johnny Green" and "Vinny TV" are references to Louis Attanasio, John Faraci, and Vincent Badalamenti, respectively, who then were all high-ranking members of the Bonanno organized crime family of La Cosa Nostra. I

further believe that (a) PETILLO's reference to "Otisville," where PETILLO said he was together with Vincent Badalamenti, also known as "Vinny TV," was a reference to Otisville Federal Correctional Institution, in Otisville, New York;[4] and (b) his reference to the "bull pen," where he was together with John Faraci, also known as "Johnny Green," was a reference to the facilities in court where prisoners are housed while awaiting court appearances.[5]

20.   Later that day, Russo and CW-2, who was still equipped with a recording device, met Maragni in Staten Island, New York. A review of the consensual recording revealed that Maragni confirmed that he had discussed the collection of $100,000 from "Patty Book" with the defendant JOSEPH PETTILLO and raised the topic with "Vinny TV" (a reference to Badalamenti) who said that he [Vinny TV] had not seen "Patty Book" in twelve years and it would be his [Vinny TV's] pleasure to help out in collecting the outstanding debt.

21.   In light of the information provided by CW-1 and CW-2 and the consensual recordings, there is probable cause to believe that PETILLO knowingly and intentionally conspired to participate in the use of extortionate means to collect and

---

[4]   Bureau of Prisons records reveal that PETILLO and Badalamenti were incarcerated together at Otisville Federal Correctional Institution between March 17, 2004 and March 15, 2005.

[5]   Court records reveal that on or about April 5, 2001, PETILLO and John Faraci both appeared in court before the Honorable Reena Raggi (but in separate cases).

attempt to collect an extension of credit from John Doe.

22. Because public filing of this document could result in a risk of flight by the defendant, as well as jeopardize the government's investigation, your deponent respectfully requests that the complaint and arrest warrant be filed under seal.

WHEREFORE, your deponent respectfully requests that an arrest warrant be issued for the defendant JOSEPH PETILLO so that he may be dealt with according to law.

Dated: Brooklyn, New York
October 24, 2011

SCOTT CURTIS
Special Agent
Federal Bureau of Investigation

Sworn to before me this
24th day of October, 2011

THE HONORABLE RAMON E. REYES, JR.
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK